## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| In re, <br><br> Richardson Miles Hanckel, III, <br><br><div align="right">Debtor.</div> <br> Kevin Campbell, Trustee, <br><br><div align="right">Plaintiff,</div><br> v. <br><br> R.M. Hanckel, III; Hanckel Marine, LLC; Pamela Hanckel; and R.M. Hanckel, Jr., <br><br><div align="right">Defendants.</div> | Case No. 12-04936-dd <br><br> Adv. Pro. No. 12-80247-dd <br><br> Chapter 7 <br><br> **ORDER** |

    This matter is before the Court on cross-motions for summary judgment filed by the plaintiff, Kevin Campbell, Trustee ("Plaintiff") and the defendants, R.M. Hanckel, III; Hanckel Marine, LLC; Pamela Hanckel; and R.M. Hanckel, Jr. ("Defendants"). Also before the Court are a second motion in limine, third motion in limine, and a motion to allow filing out of time filed by Defendants. Plaintiff responded in opposition to Defendants' motion for summary judgment and motions in limine. Plaintiff responded to the motion to allow filing out of time and indicated he did not oppose Defendants being permitted to file their motion for summary judgment and third motion in limine one day after the scheduling order deadline for such motions. Defendants responded in opposition to Plaintiff's motion for summary judgment. The Court held a hearing on the motions on March 25, 2014. After careful consideration of the applicable law, arguments of counsel, and evidence submitted, the Court rules as follows with respect to the motions before it.

## JURISDICTION AND AUTHORITY TO ENTER A FINAL ORDER

The issue in this adversary proceeding is whether R.M. Hanckel, III fraudulently conveyed his interest in Hanckel Marine, LLC to R.M. Hanckel, Jr. Jurisdiction for this proceeding is premised upon 28 U.S.C. §§ 1334 and 157(a). Venue is proper under 28 U.S.C. § 1409. This adversary proceeding is a core proceeding. 28 U.S.C. § 157(b)(2)(H). This Court has previously concluded that its entering a final order or judgment in an action to set aside a fraudulent conveyance would be inconsistent with Article III of the United States Constitution without the express consent of the parties. *Vieira v. Clutts* (*In re Clutts*), C/A No. 13-00184-DD, Adv. Pro. No. 13-80068-DD, p. 2 (Bankr. D.S.C. Dec. 6, 2013). At the March 25, 2014 hearing, Defendants' counsel expressly consented on the record to this Court entering a final order or judgment. Plaintiff's counsel expressly consented at a previous hearing.

## FACTS

Hanckel Marine, LLC was established in 2000. Richardson Miles Hanckel, III, also known as R.M. Hanckel, III ("Milo"), held a fifty percent membership interest in Hanckel Marine, LLC. Milo's father, R.M. Hanckel, Jr. ("Miles"), held the remaining fifty percent interest. In 2004, Steve Potts approved Hanckel Marine as an authorized Scout Boats dealer and eventually entered into a business arrangement with Milo to create the Sportsman's Island facility on Daniel Island, South Carolina, which was to be the new location for Hanckel Marine. Potts founded Scout Boats and is currently the president and chief executive officer of Scout.

In 2009, with the recreational and marine industry in decline, Milo defaulted on his obligations to Potts in connection with Sportsman's Island. The Hanckels also struggled with other obligations during this time. In May 2010, a judgment in the amount of $418,239.37 was

2

entered against Milo and Hanckel Marine in a case filed by Caroline and Malcolm Rhodes arising out of a breach of a lease and guaranty. Pl.'s ex. C. Subsequently, Milo and Hanckel Marine entered into a "SETTLEMENT AGREEMENT AND MUTUAL RELEASE" dated August 31, 2010, with the Rhodes under which Pamela Hanckel ("Pam"), Milo's mother and Miles' spouse, would pay $30,000 to the Rhodes and the Rhodes would assign the judgment to Pam. *Id*.

On October 12, 2010, Defendants' attorney at that time emailed Milo, Pam, and Jeff Hutto, who was the Defendants' accountant, regarding dealing with the obligations to Potts:

> Here is my overture to Potts' attorney. Note my insistence that Miles, Pam, [Hanckel Marine], and [Hanckel Properties, LLC] be protected.
> Jeff, it seems to me to be advantageous to take Milo out of Hanckel Marine by a transfer of his interest to Miles and Pam. If and when Milo has to file, I would rather not list an interest in [Hanckel Marine] among his assets. A big creditor like Potts might find it tempting to make mischief out of that situation, even though Milo's interest will have a negative value for some time to come.

Pl.'s ex. J. On November 30, 2010, the same attorney emailed Milo, Pam, and Jeff Hutto regarding his negotiations with respect to a debt owed to Wells Fargo and again discussed dealing with Milo's interest in Hanckel Marine:

> Note that I have suggested that Milo be left out of any new agreement. I anticipate that sooner or later we will have to deal with the Potts' liability, which may involve Milo's bankruptcy, and in the meantime, we are going to transfer Milo's interest in [Hanckel Marine] to Miles, and distance him from [Hanckel Marine] so that the company is not affected at all should Milo have to file Chapter 7.

Pl's ex. K.

In December 2010, Miles, Milo, Hanckel Marine, and Hanckel Properties, LLC entered into a "SETTLEMENT AGREEMENT" to resolve their debt to Hanckel Marine's floor plan

3

lender, Fifth Third Bank. Pl.'s ex. D. Also in December 2010 Pam entered into a forbearance agreement with Wells Fargo combining three notes of Hanckel Properties and Hanckel Marine.

On January 25, 2011, Milo and two entities for which he was the managing member entered into an agreement regarding obligations owed to Potts; Potts Family Properties, LP; and Sportsman's Island, LLC (the "Potts creditors"). Pl.'s ex. G. Milo agreed to pay the Potts creditors $228,006 pursuant to a payment schedule and to pay $1,598,400 on an indebtedness to Wachovia pursuant to a payment schedule. *Id.* In exchange, Milo's responsibility for expenses under certain leases would be terminated, the Potts creditors would release any claim they had against Milo related to the indebtedness, and the Potts creditors would pay the remainder of the $3,996,000 indebtedness owed to Wachovia. *Id.* While Defendants do not dispute Milo's signature is on this agreement, they assert Milo never represented any intention or ability to pay the debt owed to the Potts creditors. Defs.' Obj. Pl.'s Mot. Summ. J., p. 3 (Docket # 95).

Later in 2011, Hanckel Marine, Milo, and Miles signed an "AGREEMENT TO TRANSFER SHARES OF DISSOCIATING MEMBER" ("Dissociation Agreement") effective July 18, 2011. Under "Section 1.1 Declaration of Dissociation," the agreement states:

> The Dissociating Member [Milo] hereby declares that he is voluntarily dissociating from the Company; that he is aware of the terms of the Operating Agreement which result in the transfer of his ownership interest to the Remaining Member [Miles]; and that he affirms and agrees that the sole consideration to which he is entitled and expects to receive under the terms of this dissociation and transfer of ownership interest is the sum of Ten and 00/100 Dollars ($10.00).

Pl.'s ex. H. The Dissociation Agreement also provides that Miles "acknowledges and agrees that he shall, on behalf of the Company and in full satisfaction of the Company's duties and authority under the Operating Agreement, pay to the Dissociating Member the sum of Ten and 00/100 Dollars ($10.00)." *Id.* The Dissociation Agreement further sets forth that Milo "by his signature below, acknowledges the receipt and sufficiency of the above-described payment as full and

4

complete consideration supporting this Agreement and that it represents the full measure of compensation, disbursement, distribution, and value associated with his ownership and other interests in the Company which is being conveyed hereby." *Id.*

During his deposition, Milo testified as follows regarding what he received in exchange for transferring his interest in Hanckel Marine:

> Q. What did you receive in exchange for transferring your interests in Hanckel Marine to your father?
> A. Absolutely nothing. The business at this point has no value and had no value at these dates and now.
> Q. Section 1.1 of that document says you received $10. Did you actually receive $10?
> A. Technically, yes, as far as - -
> Q. Pass ten bucks over the table?
> A. Exactly. Yes.

R. Miles Hanckel, III Dep., p. 32-33. At his earlier Federal Rule of Bankruptcy Procedure 2004 examination, Milo testified he did not receive the $10 recited in the Dissociation Agreement.[1] Additionally, in their motion for summary judgment and response in opposition to Plaintiff's motion for summary judgment, Defendants concede that Milo did not receive any money when he entered into the Dissociation Agreement. Defs.' Mot. Summ. J., pp. 3, 16 (Docket # 91); Defs.' Obj. Pl.'s Mot. Summ. J., p. 4 (Docket # 95). Defendants' counsel did not retract this concession at the hearing on the parties' motions for summary judgment.

In October of 2011, the Potts creditors filed suit in state court in South Carolina against Milo and two other entities with which Milo was associated. This lawsuit was concluded by a consent order of judgment entered on May 17, 2012, in the amount of $1,953,927.71. Pl.'s ex. I.

---

[1] The Rule 2004 examination transcript has not been provided to the Court, but Plaintiff asserts in his motion for summary judgment that Milo testified the $10 was not exchanged, Pl's Mem. Supp. Mot. Summ. J., p. 25 (Docket # 100), and Defendants have not disputed this assertion.

Milo filed for relief under chapter 7 of the Bankruptcy Code on August 9, 2012. His bankruptcy case was assigned case number 12-04936-dd. In his schedules, Milo listed no secured debt and $2,031,066 in unsecured debt of which $1,826,406 was indicated as owed to Potts and Sportsman's Island. Case No. 12-04936-dd, docket entry 1. In his statement of financial affairs, Milo listed the transfer of his interest in Hanckel Marine in response to question 10, which required him to list "all other property, other than property transferred in the ordinary course of the business or financial affairs of the debtor, transferred either absolutely or as security within **two years** immediately preceding the commencement of [his bankruptcy] case." *Id* at docket entry 8. Under the column "DESCRIBE PROPERTY TRANSFERRED AND VALUE RECEIVED," Milo stated "Shares of stock of dissociating member in the LLC $0. Debtor gave up his 50% interest in the LLC because he could not contribute to the LLC as he should have. Debtor believes the stock was valueless." *Id*. Debtor signed his schedules and statement of financial affairs under penalty of perjury.

Only two creditors filed proofs of claim in Milo's bankruptcy. Capital One Bank filed a claim for $13,356.89. The Potts creditors filed a proof of claim for $1,953,927.71 on January 24, 2013. The Potts creditors initiated this adversary proceeding on November 13, 2012, requesting a jury trial and alleging causes of action for constructive fraud and fraudulent transfer with Milo named as the only defendant. The chapter 7 trustee filed an application to employ the attorney representing the Potts creditors on April 5, 2013, and the Court entered an Order authorizing the employment on April 17, 2013. In his affidavit accompanying the application to employ, the attorney stated the chapter 7 trustee would be substituted as plaintiff in this adversary proceeding. In August of 2013, the Court granted a motion to amend the complaint. The amended complaint substituted the chapter 7 trustee as plaintiff, did not request a jury trial,

6

alleged three different fraudulent conveyance causes of action, and added Hanckel Marine, Miles, and Pam as defendants. Plaintiff moved to amend the complaint again in November 2013, and the Court granted the motion. This second amended complaint again did not request a jury trial and alleged causes of action for fraudulent transfer under 11 U.S.C. § 548 and South Carolina Code Annotated § 27-23-10 along with a cause of action for actual and constructive fraud.

## **SUMMARY JUDGMENT STANDARD**

Pursuant to Federal Rule of Civil Procedure 56(a), made applicable by Bankruptcy Rule 7056, the moving party is entitled to summary judgment if the pleadings, responses to discovery, and the record reveal that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A genuine dispute of material fact exists "if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

As the party seeking summary judgment, the moving party bears the initial responsibility of informing this Court of the basis for its motion. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). This requires that the moving party identify those portions of the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine dispute of material fact. *Celotex*, 477 U.S. at 323; *see also Anderson*, 477 U.S. at 249.

Though the moving party bears this initial responsibility, the nonmoving party must then produce "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324; *see* Fed R. Civ. P. 56(e). In satisfying this burden, the nonmoving party must offer more than a

mere "scintilla of evidence" that a genuine dispute of material fact exists, *Anderson*, 477 U.S. at 252, or that there is "some metaphysical doubt" as to material facts, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  One of the purposes of summary judgment is to determine whether the parties can provide evidentiary support for their version of the facts.  If a party has credible evidence for its position, it must make the existence of such evidence known because summary judgment cannot be defeated by the vague hope that something may turn up at trial.  *Id.* at 586.  The Court is not obligated to search the record for the non-moving party's evidence.  *Harris v. Pyramid Gom, Inc.* (*In re Capco Energy, Inc.*), Bankr. No. 08-32282, Adversary No. 10-3349, 2012 WL 253140, *4 (Bankr. S.D. Tex. Jan. 25, 2012)).

On a motion for summary judgment, "'the facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts.'" *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).  Summary judgment is proper "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there [being] no genuine issue for trial." *Matsushita*, 475 U.S. at 587 (internal quotation marks omitted).

## ANALYSIS

**A. Statute of Elizabeth**

*1. Law*

Under 11 U.S.C. § 544(b)(1), a "trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is

8

not allowable only under section 502(e) of this title." Pursuant to South Carolina's Statute of Elizabeth:

> Every gift, grant, alienation, bargain, transfer, and conveyance of lands, tenements, or hereditaments, goods and chattels or any of them . . . , by writing or otherwise, . . . which may be had or made to or for any intent or purpose to delay, hinder, or defraud creditors and others of their just and lawful actions, suits, debts, accounts, damages, penalties, and forfeitures must be deemed and taken (only as against that person or persons, his or their heirs, successors, executors, administrators and assigns, and every one of them whose actions, suits, debts, accounts, damages, penalties, and forfeitures by guileful, covinous, or fraudulent devices and practices are, must, or might be in any ways disturbed, hindered, delayed, or defrauded) to be clearly and utterly void, frustrate and of no effect, any pretense, color, feigned consideration, expressing of use, or any other matter or thing to the contrary notwithstanding.

S.C. Code Ann. § 27-23-10(A). Section 544(b)(1) allows Plaintiff to "step into the shoes" of creditors and assert their rights under the Statute of Elizabeth, provided there is a "creditor with a valid unsecured claim in the bankruptcy case who could assert a claim to avoid the transfer." *Hovis v. Ducate* (*In re Ducate*), 369 B.R. 251, 258 (Bankr. D.S.C. 2007); *see also Campbell v. Deans* (*In re J.R. Deans Co.*), 249 B.R. 121, 129 (Bankr. D.S.C. 2000). The trustee's power to set aside transfers is for the benefit of all creditors. *Moore v. Bay*, 284 U.S. 4 (1931). Defendants have not disputed that Capital One Bank and the Potts creditors have allowed unsecured claims. Under the Statute of Elizabeth, conveyances may be set aside by creditors existing at the time of the transfer and by subsequent creditors. *Mathis v. Burton*, 460 S.E.2d 406, 408 (S.C. Ct. App. 1995). For existing creditors, the South Carolina Supreme Court has held that conveyances may be set aside pursuant to the Statute of Elizabeth under two scenarios: "First, where the transfer is made by the grantor with the actual intent of defrauding his creditors where that intent is imputable to the grantee, even though there is a valuable consideration; and, second, where a transfer is made without actual intent to defraud the grantor's creditors, but

9

without consideration." *Windsor Prop., Inc. v. Dolphin Head Constr. Co.*, 498 S.E.2d 858, 860 (S.C. 1998).

   *2. Transfer of property*

Defendants assert in their motion for summary judgment and objection to Plaintiff's motion for summary judgment that no transfer of a property interest occurred when Milo conveyed his interest in Hanckel Marine because Milo's interest in Hanckel Marine pursuant to its operating agreement was an executory contract and not property of the estate. Defendants argue a claim under section 544 may only lie against property of estate. Defendants rely on *Fursman v. Ulrich* (*In re First Prot., Inc.*), 440 B.R. 821, 830-31 (B.A.P. 9th Cir 2010); *Sheehan v. Warner* (*In re Warner*), 480 B.R. 641, 648 (Bankr. N.D.W. Va. 2012); *Meiburger v. Endeka Enter., L.L.C.* (*In re Tsiaoushis*), 383 B.R. 616, 620 (Bankr. E.D. Va. 2007); *In re Garrison-Ashburn, L.C.*, 253 B.R. 700, 708 (Bankr. E.D. Va. 2000); *Broyhill v. DeLuca* (*In re DeLuca*), 194 B.R. 65 (Bankr. E.D. Va. 1996); and *In re Daugherty Constr., Inc.*, 188 B.R. 607, 612 (Bankr. D. Neb. 1995). Defendants also rely on the definition of an executory contract set forth by Professor Vern Countryman, which is used by the Fourth Circuit and many other courts. *Gloria Mfg. Corp. v. Int'l Ladies Garment Workers' Union*, 734 F.2d 1020, 1021-22 (4th Cir. 1984). Under the "Countryman definition," an executory contract is one "under which the obligations of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete the performance would constitute a material breach excusing the performance of the other." *Id*. at 1022. Defendants assert there was an ongoing obligation among members of Hanckel Marine to make capital contributions if the company was unable to meet its ongoing responsibilities. Defendants argue Milo breached the operating agreement because he was unable to make ongoing capital contributions and dissociated as a result.

10

The evidence before the Court does not support Defendants' assertion regarding an ongoing obligation among members of Hanckel Marine to make capital contributions. The Hanckel Marine operating agreement provides for initial contributions and subsequent contributions ("capital calls"). Pl's ex. A, pp. 15-16. The operating agreement also provides for advances to Hanckel Marine if the company is unable to pay its obligations. *Id*. at p. 17. These advances constitute loans from the advancing member to the company. *Id*. at p. 17. With respect to capital calls, the operating agreement provides "each Member shall contribute to the Company, in cash, on or before the date specified as hereinafter described that Member's pro rata share of all monies that in the judgment of a *Required Interest*, is necessary to enable the Company to cause the assets of the Company to be properly operated and maintained and to discharge its costs, expenses, obligations, and liabilities." *Id.* at pp. 15-16 (emphasis added). A "Required Interest" is defined as "One Hundred (100 %) percent of all Members." *Id*. at p. 4. Consequently, because Milo held a fifty percent membership interest in Hanckel Marine and because one hundred percent of all members had to agree to a capital call, Milo was not required to make a subsequent capital contribution unless both he and Miles agreed to a capital call. Defendants have not cited evidence in the record upon which a rational trier of fact could find Milo agreed to a capital call even though he could not contribute his portion, thus resulting in his parents essentially loaning him money to cover his portion.[2] Furthermore, Miles testified he did not ask Milo to infuse money into Hanckel Marine and made no distinction between capital

---

[2] When asked whether any capital calls were made, Milo responded: "Capital calls as in - - yeah. We sat down and said this is the state of the company right now. We know we have to have X amount of dollars to do this. X amount of dollars to get through winter. Whatever it may be. And we were fortunate for them to be able to do that, but I did not. So a true capital call? Formal? No, but knowing money has to come from somewhere if this business is going to stay afloat." R. Miles Hanckel, III Dep., pp. 23-24. Milo did not testify he agreed to capital call he knew he could not meet and that would result in his parents effectively loaning him money to cover his portion.

11

infused into the company and loans to the company. R.M. Hanckel, Jr. Dep., p. 17-18. In light of this deposition testimony and the language in the operating agreement, Defendants have not provided evidence to support their assertion of an ongoing obligation to make capital contributions. Rather, Milo only had to contribute further capital if he agreed to do so. This absence of evidence of ongoing obligations leads the Court to conclude that the operating agreement is not an executory contract.

Furthermore, while federal law creates the bankruptcy estate, "[p]roperty interests are created and defined by state law[, and] [u]nless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding." *Butner v. United States*, 440 U.S. 48, 55 (1979); *see also Am. Bankers Ins. Co. of Fla. v. Maness*, 101 F.3d 358, 363 (4th Cir. 1996); *In re Brittain*, 435 B.R. 318, 321-22 (Bankr. D.S.C. 2010). Milo's interest in Hanckel Marine consisted of both his management rights and distributional interest. Through the July 18, 2011 Dissociation Agreement, Milo lost his management rights by dissociating himself. *See* S.C. Code Ann. § 33-44-603(3) ("Upon a member's dissociation . . . the member's right to participate in the management and conduct of the company's business terminates, except as otherwise provided in Section 33-44-803, and the member ceases to be a member and is treated the same as a transferee of a member.").[3] Milo not only dissociated himself via the Dissociation Agreement but also transferred his distributional interest to Miles. Under South Carolina law, "[a] distributional interest in a limited liability company is personal property . . . ." S.C. Code Ann. § 33-44-501(b); *Brittain*, 435 B.R. at 322. Nothing in the operating agreement alters this state law, as the operating agreement specifically allows for the assignment of a member's distributional

---

[3] Section 33-44-803 deals with a dissociated member's right to participate in winding up the company.

12

interest. *See* S.C. Code Ann. § 33-44-103(a) ("To the extent the operating agreement does not otherwise provide, this chapter governs relations among the members, managers, and company."); Pl.'s ex. A, p. 14.

The Court has reviewed the cases Defendants cite in support of their argument that no transfer of property occurred and does not find them persuasive. Notably, it was only in two of the cases cited by Defendants that the courts actually concluded the operating agreements at issue were executory contracts—*DeLuca* and *Daugherty Construction*. Neither of these cases involved an alleged fraudulent transfer of a debtor's membership interest in a limited liability company prior to filing bankruptcy. Moreover, *Daugherty Construction* involved a chapter 11 debtor in possession that may have been attempting to assume the executory contract and the bankruptcy court stated its ruling was limited to that chapter 11 reorganization case and expressed no opinion as to what its ruling might be in the chapter 7 context. *Daugherty Constr.*, 188 B.R. at 613-14.

*3. Voluntary Conveyance*

Under South Carolina law, a voluntary conveyance may be avoided without proving actual intent to defraud creditors. *Royal Z Lanes, Inc. v. Collins Holding Corp.*, 524 S.E.2d 621, 622 (S.C. 1999). A voluntary conveyance means a gratuitous transfer made without valuable consideration. *Id.* "[V]aluable consideration, in the sense of the law, may consist either in some right, interest, profit, or benefit, accruing to the one party, or some forbearance, detriment, loss, or responsibility given, suffered, or undertaken by the other. *Furman Univ. v. Waller*, 117 S.E. 356, 358 (S.C. 1923); *see also Cadence Bank, N.A. v. Horry Prop., LLC*, No. 4:10-cv-2717-RBH, 2012 WL 1110089, at *14 (D.S.C. Apr. 2, 2012). Grossly inadequate consideration does not render a conveyance voluntary; rather, the inadequacy of the consideration is treated as a

13

"badge of fraud," and actual intent to defraud must be proven. *Royal Z Lanes*, 524 S.E.2d at 622-23. To set aside a voluntary conveyance, the plaintiff must show that "(1) the grantor was indebted to him at the time of the transfer; (2) the conveyance was voluntary; and (3) the grantor failed to retain sufficient property to pay the indebtedness to the plaintiff in full—not merely at the time of the transfer, but in the final analysis when the creditor seeks to collect his debt." *Mathis*, 460 S.E.2d at 408. In situations such as in this case "[w]here transfers to members of the family are attacked . . . on account of their voluntary character, the law imposes the burden on the transferee to establish both a valuable consideration and the bona fides of the transaction by clear and convincing testimony." *Windsor Prop.*, 498 S.E.2d at 860 (quoting *Gardner v. Kirven*, 191 S.E. 814, 816 (S.C. 1937)); *see also Hovis v. Ducate* (*In re Ducate*), 355 B.R. 536, 544 (Bankr. D.S.C. 2006); *Campbell v. Haddock* (*In re Haddock*), 246 B.R. 810, 816 (Bankr. D.S.C. 2000).

The Dissociation Agreement Milo and Miles signed states that $10 is the "full and complete consideration supporting [the] Agreement and that it represents the full measure of compensation, disbursement, distribution, and value associated with [Milo's] ownership and other interests in the Company which is being conveyed hereby." Pl.'s ex. H. Milo testified at his deposition that $10 was exchanged but testified during his Rule 2004 examination that it was not. R. Miles Hanckel, III Dep., p. 32-33; Pl's Mem. Supp. Mot. Summ. J., p. 25 (Docket # 100). Additionally, Defendants conceded that Milo did not receive any money when he entered into the Dissociation Agreement in the briefing before the Court. Defs.' Mot. Summ. J., pp. 3, 16 (Docket # 91); Defs.' Obj. Pl.'s Mot. Summ. J., p. 4 (Docket # 95). Defendants' counsel did not retract this concession at the hearing on the motions. Moreover, in his statement of financial affairs signed under penalty of perjury in his bankruptcy case, Milo indicated he received

14

nothing for his interest in Hanckel Marine. Bankruptcy Case No. 12-04936-dd, docket entry 8. In light of the contradictory testimony by Milo and Defendants' concession, the Court concludes Milo did not receive $10 for his interest in Hanckel Marine and there is no genuine dispute of material fact over this issue. *See Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984) ("A genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct.").

Nonetheless, Defendants assert consideration was exchanged in the form of Milo (1) being "relieved of the ongoing requirement that he contribute capital to the LLC, which he was unable to do," and (2) being "relieved of the personal obligation to repay Miles and Pam's contributions and loans that were made to offset his inability to contribute." Defs.' Obj. Pl.'s Mot. Summ. J., p. 4 (Docket # 95). With respect the first argument, Defendants cite to no evidence that Miles and Milo viewed Milo being relieved of making future contributions of capital to Hanckel Marine as constituting consideration for the transfer. Even if there was such evidence, Milo was not obligated to make subsequent capital contributions to Hanckel Marine unless both he and Miles agreed on a capital call. Pl.'s Ex. A, p. 15-16. Therefore, there was no release of an obligation on Milo's part to make future capital contributions that would constitute consideration for the transfer.

Defendants' second argument is Milo was relieved of his obligation to repay his parents for all the contributions they assert they made to Hanckel Marine to keep it operating when Milo was financially unable to contribute. However, Defendants have not presented evidence upon which a rational trier of fact could find that Miles and Milo agreed there should be a capital call and of Milo subsequently being unable to contribute his portion. Pl.'s Ex. A, p. 15-16. Absent Miles and Milo agreeing to a capital call, the provision of the operating agreement which

15

provides that the portion one member contributes to cover another member's portion of a capital call constitutes a loan to that member does not apply. Pl.'s Ex. A, p. 16. Also the Court has reviewed the deposition testimony Defendants cite in support of this argument, and the testimony is not to the effect that Miles and Pam viewed Milo as being obligated to repay them to the extent they covered Milo's portion of agreed capital calls and that they were releasing Milo from this liability in exchange for his interest in Hanckel Marine. *See* Defs.' Obj. Pl.'s Mot. Summ. J., p. 9 (Docket # 95) (citing deposition testimony in support of argument transfer was made in exchange for releasing Milo from liability for his share of past capital contributions). Rather, Miles testified he did not ask Milo to infuse money into Hanckel Marine. R.M. Hanckel, Jr. Dep., p. 18; *see also First Union Nat'l Bank of N.C. v. Smith*, 445 S.E.2d 457, 461-62 (S.C. Ct. App. 1994) (holding son and father failed to prove the son gave the father a mortgage on the son's house in exchange for past loans the father had made to the son). In addition, the Hanckel Marine operating agreement provides for advances by members if the company lacks sufficient cash to pay its obligations and states such advances constitute a loan from the member to the company. Pl.'s ex. A, p. 17. If Miles' contributions to Hanckel Marine constituted advances under this section of the operating agreement, Milo would not have been personally obligated to repay those advances. To prevail on their argument, Defendants would need to show that the funds Miles and Pam provided to Hanckel Marine were in fact capital contributions and not advances to the company. Miles testified he made no distinction between capital infused into the company and loans to the company. R.M. Hanckel, Jr. Dep., p. 17. As a result, Defendants have not presented evidence upon which a rational trier of fact could find that Miles' contributions were capital contributions upon which Miles and Milo agreed and for which Milo was liable as opposed to advances to Hanckel Marine that Hanckel Marine was responsible for repaying.

16

Defendants' other arguments are also unavailing. Defendants assert the transfer of Milo's interest allowed Hanckel Marine to obtain credit that was unavailable as long as he was an insolvent member of the company, which indirectly allowed Milo to remain employed by Hanckel Marine. However, nothing has been presented to the Court to suggest that Milo was not already employed by Hanckel Marine at the time of the transfer. Consequently, his employment with the company was not consideration for the transfer, as he did not receive employment in exchange for transferring his interest. Defendants also reference no evidence that Miles and Milo viewed Milo's continuing employment as consideration. Finally, Defendants argue consideration was not required because Milo's membership interest had no value but cite to no authority supporting the proposition that a transfer should not be considered voluntary under South Carolina law if what is transferred has no value. Further, if Milo's interest was truly worthless, then why transfer it instead of leaving the interest under Milo's ownership and allowing the chapter 7 trustee to assess whether it was worthless. The fact is Miles has a one hundred percent interest in Hanckel Marine as a result of the transfer of Milo's fifty percent interest, and Defendants have not presented evidence upon which a rational trier of fact could find Milo received valuable consideration in exchange.

As for the remaining elements for setting aside a voluntary conveyance, it is undisputed that Milo was indebted to Capital One Bank and the Potts creditors at the time of transfer and that he did not retain sufficient assets to pay the indebtedness. Consequently, Plaintiff is entitled to summary judgment on his cause of action to set aside Milo's transfer of his interest in Hanckel Marine under 11 U.S.C. § 544(b)(1).

*4. Remedy*

Under 11 U.S.C. § 550(a), to the extent a transfer is avoided under section 544, "the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from . . . the initial transferee of such transfer or the entity for whose benefit such transfer was made . . . ." Miles is the initial transferee of Milo's interest in Hanckel Marine. Given the recoverability of Milo's interest, the difficulty in valuing his interest, and the lack of evidence of any depreciation in the interest's value since the transfer, the Court concludes the appropriate remedy is the recovery of the property transferred, which in this case is the interest in Hanckel Marine Milo transferred to Miles. *See Morris v. Kan. Drywall Supply Co. (In re Classic Drywall, Inc.)*, 127 B.R. 874, 877 (D. Kan. 1991) (discussing factors courts commonly apply in deciding between a return of the property or an award of its value). The issue of whether the operating agreement limits what Plaintiff can do with Milo's management rights, including whether Plaintiff can convey those rights to someone else, is not before the Court. *See Warner*, 480 B.R. at 656-58; *Caymus Ventures, LLC v. Jundanian* (*In re Jundanian*), Bankr. No. 10-21513-TJC, Adv. Pro. No. 11-00185, 2012 WL 1098544, at *6-*7 (Bankr. D. Md. Mar. 30, 2012)

**B. Remaining causes of action**

Plaintiff's other two causes of action are fraudulent conveyance pursuant to 11 U.S.C. § 548 and actual and constructive fraud under South Carolina common law. Section 550(a) provides the same remedy for a conveyance set aside under section 548 as it does for a transfer set aside under section 544. As a result, having set aside the conveyance under section 544 and determining recovery of the property appropriate, Plaintiff is entitled to no further remedy on his section 548 cause of action.

As for the common law actual and constructive fraud cause of action, the basis for this cause of action is the same as the other causes of action—Milo's transfer of his interest in Hanckel Marine. Plaintiff has not cited to and the Court is unaware of any legal principle that gives a chapter 7 trustee standing to pursue a common law fraud cause of action on behalf of creditors against a debtor whose bankruptcy estate the trustee is administering or third parties such as the other defendants in this adversary proceeding. Plaintiff's actual and constructive fraud cause of action is, therefore, dismissed.

**C. Recovery against the defendants other than Miles Hanckel**

Under 11 U.S.C. § 550(a), the recovery of the transferred property is from the initial transferee, which in this case is Miles Hanckel. *See Coggin v. Coggin* (*In re Coggin*), 30 F.3d 1443, 1453 (11th Cir. 1994) ("[W]e hold that section 550(a)(1) does not allow recovery of an avoided transfer from the transferring debtor."), *abrogated on other issues by Kontrick v. Ryan*, 540 U.S. 443 (2004). No basis has been provided for the Court to enter judgment against the other defendants in this adversary proceeding. Therefore, they are dismissed.

## CONCLUSION

For the reasons set forth herein, Defendants' motion to allow filing out of time is granted as unopposed; Plaintiff's motion for summary judgment is granted as to Plaintiff's cause of action under 11 U.S.C. § 544(b)(1) against defendant R.M. Hanckel, Jr.; Plaintiff's cause of action under 11 U.S.C. § 548 is moot; Plaintiff's cause of action for common law actual and constructive fraud is dismissed; Defendants' motion for summary judgment is denied; and Defendants' second and third motions in limine are moot. In addition, defendants R.M. Hanckel, III; Hanckel Marine, LLC; and Pamela Hanckel are dismissed from this adversary proceeding.

Pursuant to 11 U.S.C. § 550(a), Plaintiff shall recover from defendant R.M. Hanckel, Jr. the interest in Hanckel Marine that R.M. Hanckel, III transferred to R.M. Hanckel, Jr.

    AND IT IS SO ORDERED.

**FILED BY THE COURT**
**05/28/2014**



Entered: 05/28/2014

David R. Duncan
Chief US Bankruptcy Judge
District of South Carolina